UNITED STATES DISTRCT COURT
NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION

|  |  |
|---|---|
| CHANNEL (H), INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>CQUENTIA SERIES, LLC;<br>HTG SERIES, a series declared by<br>CQUENTIA SERIES, LLC; and<br>D. ALAN MEEKER,<br><br>*Defendants*. | Case No.: 4:17-cv-00916-O |

## APPENDIX IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff CHANNEL (H), INC. hereby files this Appendix in support of its Reply Memorandum of Law in Further Support of its Motion for a Preliminary Injunction.

| Document No. | Document | Appendix Pages |
|:---:|:---:|:---:|
| 1 | Supplemental Declaration of Robert Capelli | 4-49 |

1

Dated: December 22, 2017

Respectfully submitted,

By: /s/ *Brett E. Lewis*
Brett E. Lewis
(*pro hac vice*)
Justin Mercer
(*pro hac vice forthcoming*)
Lewis & Lin, LLC
45 Main Street, Suite 608
Brooklyn, New York 11201
Tel. (718) 243-9323
brett@ilawco.com
justin@ilawco.com

Of Counsel:

THE APGAR FIRM, PLLC

MARGARET HORTON APGAR
State Bar No. 24036805
1914 Skillman Street, Suite 110-150
Dallas, Texas 75206
(214) 707-2791 (Phone)
(214) 279-6050 (Fax)
margaret@apgarfirm.com

*Attorneys for Plaintiff*

2

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record and constitute service on such counsel and their represented parties pursuant to Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5.1(d).


*/s/ Brett E. Lewis*
Brett E. Lewis

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

CHANNEL (H), INC.,

                            *Plaintiff*,

        v.

CQUENTIA SERIES, LLC;
HTG SERIES, a series declared by
CQUENTIA SERIES, LLC; and
D. ALAN MEEKER,

                            *Defendants*.

Case No.: 4:17-cv-00916-O

**SUPPLEMENTAL DECLARATION OF**
**ROBERT CAPELLI**

        I, Robert Capelli, declare under penalty of perjury under the laws of the United States of

America that the following is true and correct:

        1.      I am the Chief Executive Officer of Plaintiff Channel (H), Inc. ("Channel (H)"),

and as such, have authority to discuss Channel (H)'s business.  I make this supplemental

declaration in further support of Channel (H)'s Motion for a Preliminary Injunction.  I have

personal knowledge of all matters stated herein, or I am familiar with the facts and circumstances

of the instant action based upon records and files maintained by Channel (H), or upon publicly-

available and generally verifiable records.  If called as a witness could and would testify to the

matters set forth herein.

        2.      Defendants claim in their Response to Plaintiff's Motion for Preliminary

Injunction ("Response") that, "in the end of 2016 and beginning of 2017, CQ approached Capelli

and inquired whether Channel (H), *using CQ's proprietary and trade secret process and data*

*specifications*, could develop a *fully-automated* software solution that was capable of providing a

*fully-automated*, early and accurate determination of insurance coverage for the UCSD patients

serviced by CQ." [Response, p. 3, ¶ 6.]  This claim is not true.  No part of Channel (H)'s

platform was developed using any process or data from CQ.  Put another way, CQ contributed nothing to Channel (H)'s Platform.

3. All of the Agreements with Defendants reflect that ownership in Channel (H)'s Platform, including the pre-authorization functionality, was the exclusive property of Channel (H).  If Defendants' statements were true, the Agreements would have reflected CQ's contributions to, and ownership in, the Platform – there is nothing in any of the Agreements that supports Defendants' claims that they contributed trade secrets and data to the Platform.   For example, the agreement, dated October 29, 2016 ("October 2016 Agreement") states: "[y]ou are not granted any title or intellectual property rights in or to any software provided as part of the Cloud Services and may only use that software in connection with the Cloud Services as permitted under this Agreement," and "[y]ou acknowledge that the Cloud Services are valuable proprietary intellectual property of Channel (H)." October 2016 Agreement, § 20 (**Exhibit B)**.

4. The Defendants' claim that they approached me to develop a pre-authorization functionality based on their trade secret ideas in December 2016 or January 2017, is also false.  I pitched the pre-authorization functionality of Channel (H)'s Platform to Defendants on May 16, 2016, after being introduced to CQuentia by a contact at one of my clients at the time, Allos Clinics.  This was at least six months before Defendants now vaguely claim that they came up with the idea.  A true and correct copy of a screen shot of a May 16, 2016 meeting request is annexed hereto as **Exhibit L**.  A true and correct copy of the Pitch Deck that I used during that presentation on May 16, 2016, is annexed hereto as **Exhibit M**.  Patient Service Bot "Slides 13-14" is where I pitched the functionality for preauthorization certifications, and a bit more of the depth of how the Channel (H)'s automated system works is on "Slides 10-11."

2

5.     The claim that Channel (H)'s Platform did not work, or did not function to specifications is false.  Shortly after we went live on January 18, 2017, Defendants asked me if my company was for sale.  When I declined to sell, they came back with a proposed investment. We signed a Term Sheet on May 16, 2017.  After signing the Term Sheet, we continued to talk about the investment, and how Defendants wanted me to allocate a portion of the money for new functionality and customization.  A true and correct copy of an email from Floyd Russell discussing Defendants' investment in Channel (H), dated May 31, 2017, is annexed hereto as **Exhibit N**.  Those talks continued until around mid-August, when I was told by Floyd Russell that Defendants wanted to do a perpetual license instead of the investment. **Exhibits I, J, K**.

6.     Just to correct the time frame in Defendants' brief, I received a termination notice from Defendants by email on September 28, 2017, which was two days after my attorneys sent Defendants a notice of breach. A true and correct copy of an email attaching the termination notice from CQuentia, dated September 28, 2017, is annexed hereto as **Exhibit O**.

7.     After my attorneys sent Defendants a notice of breach letter, I was still willing to negotiate a perpetual license – *as Defendants had requested* –  but was not going to let them just walk away with Channel (H)'s Platform.  Between September 26 and October 4, Kevin Jones and Alan Meeker contacted me multiple times and pressured me to accept roughly $34,000 that I was *already owed* on the license agreements in full settlement of Channel (H)'s claims.  It soon became apparent that Defendants had no intention of resolving the dispute in good faith.  On October 3, Alan Meeker called with Kevin Jones to tell me that I was "shaking him down, and he wouldn't be shook down by [me]."  He told me to take the deal on the table and they wouldn't need to go further.  He then said that although "[I] might think [my] attorney is nasty, I am nasty and fierce when it comes to people messing with my business and the tens of millions of dollars

3

I've worked hard for.  When I told Alan that I had only wanted information that they were unwilling to share about what their system was, Alan told me, "I am not showing you anything we are doing, I am not going to lift up the dress so you can see our trade secrets.  You have until 5:00pm tomorrow to sign and take the deal or I will make the next two years very unpleasant for you and your business."  He also told me, "as a mentor," not to listen to my attorney in this manner because all attorneys want to do is litigate, and he gave me until the next day to accept the deal he offered me, or he "was going to make it very unpleasant for me and my business."  I took that as a warning to walk away, or they would destroy my business by forcing Channel (H) to incur exorbitant litigation costs.  A true and correct copy of my contemporaneous notes of that conversation is annexed hereto as **Exhibit P.**

8.     The following day, Kevin Jones, in so many words, told me to take the deal or it could cost me my business.  A true and correct copy of a text message from Kevin Jones, dated October 4, 2017, as annexed hereto as **Exhibit Q.**

9.     Defendants claim that they did not "use any part of Channel (H)'s Platform," to build their competing "Preauthorization Software Solution." [Response, p.7, ¶ 17].  I don't believe that Defendants are telling the truth, and here's why:

a.     As I stated above, as soon as Channel (H)'s Platform launched, Defendants offered to buy it; then, when I wasn't interested in selling outright, they offered to invest in my company; and after that, they asked to license my solution forever.

b.     Defendants requested a perpetual license of that Platform in August – the same month in which they now claim that they realized that the Platform allegedly did not function to specifications.  Talks around a perpetual license

4

continued at least until August 28, 2017, so that means that they only decided

that the Platform did not work after they let slip on August 29 that they were

bringing it in-house.

c.   Defendants never complained to me that the Platform did not work.  From

July 3 through September 26, we were in near-daily contact over patient lists

and pre-authorizations. If the Platform had not worked properly, I would have

expected the Defendants to tell me that it wasn't working, and ask me to fix it

– they never did.  A true and correct copy of all correspondence with

Defendants on **authorizations** between July 3, 2017 and September 26, 2017

is annexed hereto as **Exhibit R**.

d.   I was involved in numerous conversations with Defendants about their plans

to use Channel (H)'s automated Platform to scale their business. Alan Meeker

told me on July 1, 2017, that Defendants were negotiating a roll-out of the

Platform across the University of California hospital system, that was worth

$150 million ("Our UCSD account is worth in excess of $150million over the

next 5 years.").  A true and correct copy of an email dated July 1, 2017 from

Alan Meeker is Annexed hereto as **Exhibit S**.

e.   Defendants were also pitching the Medstar and Wise Health hospital

networks, and United Health Care and Lockton insurance companies on

Channel (H)'s automated Platform.  I participated in discussions around

integrating Channel (H)'s software to remove the paper process on telephone

calls with Medstar and Wise Health meaning that these contracts, which were

based on the rollout of Channel (H)'s automated Platform, were going to

5

happen.  Between the two hospitals networks, I was personally on at least ten phone calls discussing integration.  Contracts with these hospital networks would have been worth probably hundreds of millions of dollars, but only if Defendants could deliver an automated solution.  CQ was not about to go back to filling out .pdf forms by hand and placing them in a box.  A true and correct copy of examples of calendar entries for conference calls with Medstar and Wise Health are Annexed hereto as **Exhibit T**.

f.   On August 29, 2017, for the first time, I learned that Defendants planned to "take the Platform in-house," when Floyd Russell let it slip during a call.  I took notes of my conversation with Floyd several days after the call, and took contemporaneous notes of calls that followed with Defendants on September 7 and 8.   A true and correct copy of my notes are annexed hereto as **Exhibits U, and V**.

g.   As reflected in my notes, the August 29, 2017 conversation with Floyd Russell went like this:

- Robert: Floyd, it sounds like you are saying you guys are going to do what Channel H is doing in house now with schedule and pre auths?
- Floyd: No, we are doing it manually.
- Robert: But you are doing what we do, manual has always been one of three ways we get results to post.  Do you receive Schedule API before the event happens, 3, 6, 10 days out ?
- Floyd: Yes
- Robert: Do you filter out the Insurance Identifiers to call coverage against?
- Floyd: Yes
- Robert: Do you get coverage results on those patients for PGX?
- Floyd: Yes, but we do it manually.
- Robert: Do you get the results to give to Nurses so they know who is

6

approved ? Do you post results to dashboard?
- Floyd: No we don't post to dashboard.
- Robert: Do you post somewhere where they can print out list for the day?
- Floyd: Yes
- Robert: Then you are doing exactly what Channel H was doing for you and UCSD.
- Floyd: So you are telling me I can't do my business?
- Robert: I am telling you are doing Channel H's business.

**Exhibit U.**

g.  My contemporaneous notes from September 7 reflect the same thing – "Floyd is bring[ing] the Schedule Api / Auths in house."  I told Kevin and Floyd to check the contracts, and to check with their attorney about the "API/ Precert / Process" before going any further. *See* **Exhibit V.**

h.  Kevin and Floyd responded on September 8 that "no attorney [was] needed," because they did the whole thing "manually." *See* **Exhibit V.**

i.  On a separate call, Kevin Jones told me that CQ's solution was permissible, because it wasn't a "derivative" of Channel (H)'s Platform.  Kevin and Floyd also argued, inconsistently, that CQ had a right to build an automated platform.

j.  Despite claiming that their process was entirely manual – which was totally implausible – they have now admitted in their state court Petition that they built a "Preauthorization **Software** Solution."  A software solution is an automated solution.

k.  When Defendants terminated their agreements with Channel (H), they claimed, for the first time, that the Platform did not work.  This was a huge

7

red flag for me, as Defendants had *never* claimed previously that the Platform did not function properly.  To the contrary, all of the talk was about buying, investing in or licensing Channel (H)'s proprietary solution forever, and they were actively rolling out the Platform to Medstar and Wise Health.  Because I knew that they were engaged with hospital networks on the use of our technology, it did not add up that, all of a sudden, they were claiming that the Platform did not work.

10. Additionally, Defendants could not possibly have built a solution that does what Channel (H)'s Platform does in a month or less, as Floyd Russell claims.  Channel (H) is a software development company, that develops software for real-time, bi-directional communication between prescribers of services and goods, and vendors that fulfill services and goods.   I am a project manager with eight years of experience working on real-time technologies, audience participation platforms, connected device engagement, and building white label solutions for large entertainment and media companies, such as Yahoo 7, Viggle, and Spike TV.  Channel (H) has hired a dozen programmers to work on the Platform, over the course of the past two-and-a-half years.  Defendants are not a software development company – they are a diagnostic company.

11. It took Channel (H) roughly one-and-a-half years to develop the Platform.  The reason for this is that development involves a lot of trial and error.  The first person to program a solution has to figure out what the mistakes are, and what the obstacles are, and how to get around them – this takes time.

8

12. Based off of Brooke's Law and also the general law of diminished returns in economics, it is improbable if not virtually impossible for Floyd Russell and CQuentia Series, LLC, to have built a completely unique Pre-Certification System with "zero" reference to Channel (H)'s system in a single month.

13. Over an 18-month period, Channel (H) had been architecting and building technologies that power real-time engagement experiences in healthcare that brought to life our Pre-Certification software solution.  Floyd and CQuentia are alluding that they basically had ten darts to throw and got a bullseye with their eyes closed for all ten.  Or another way of saying it, Floyd and CQuentia developed the golden key to a 31 billion dollar industry in one month, without using any knowledge of the product they had been using with us hand-in-hand, and had access to in the Github Account, for months.

14. There is a story in software development about how you can't make a baby with 9 women in 1 month – the general reason is, complex things need time to develop.  The first thing when building software is to identify and acknowledge the "problem.," then set out to build a solution to "fix" the problem.  This generally begins with a theory of how you plan on "fixing" the problem—what technologies will be used, what needs to be built first, second, and so on.  Then the team goes about tackling the theory.  This leads to successes and inevitable failures.  Each success and failure leads you closer to the right solution to fix the problem.  This is key—you don't know what you don't know until you know it, and certain things don't show until others are surfaced, which is why complex things take time.

9

15. The only way to build something from scratch like Pre-Certification in under a month would be to take what you took from Channel (H), and basically remove all "don't knows" and "failures" and hit a bullseye each time you throw a developmental dart.

16. Floyd Russell claims that he did just that, but provides no details of what his system is, how it works, or how he was able to develop it in such a short time.  He also claims that he had to build his own system because the automation in Channel (H)'s system did not work well enough, but then claims to have built a "completely different" **manual system** to replace it. [Russell Decl., ¶¶ 6-7].

17. If Defendants could have built a system that does what the Platform does in less than a month, it begs the question why they entered into multiple licensing agreements with Channel (H) in the first place and tried to buy my company – it just doesn't add up.

18. Floyd Russell also claims that he only looked at three source code files, before uncovering that the source code was written in Ruby on Rails, and then "had no desire to and did not view any additional source code files within the Github Account because, based on my twenty years of experience, I knew that code written in Ruby on Rails was incapable of scaling or meeting the performance needs projected by CQ."  Floyd L. Russell Declaration ("Russell Decl.")., ¶ 4.  Putting aside the fact that numerous large, well-known Web sites are programmed using Ruby on Rails, Floyd's statement in his declaration is not consistent with how he acted after gaining access to the Github Account.  As his email from May 31 shows, he did not express concerns that the source code would not scale or meet CQ's requirements.  Rather, he discussed conditions around how CQ wanted me to use the proposed investment

10

funds in Channel (H)'s business, and invited me to Memphis to continue those discussions. *See* **Exhibit N**.  In fact, I flew down to Memphis on June 6 to meet with Floyd and discuss how Channel (H) would use Defendants' investment to develop and customize functionality. *See* **Exhibit N**.

19. In that meeting in Memphis, I showed Floyd and Ken Jones the admin platform, which is the back end of Channel (H)'s Platform.  Put another way, it's the operating system of Channel (H) – it shows **all** of the data that's available, **all** of the connections to that data, and the intelligence run across that data (e.g., authorizations, certification, eligibility).  Floyd and Ken unquestionably had access to Channel (H)'s trade secrets.  In preparation for an earlier telephonic meeting in February 2017, I gave a .pdf of multiple screenshots of the admin panel to Floyd Russell, Kenny Woods, Alan Meeker and Jamison Feramisco.  Following that meeting, Defendants stated that they wanted to buy my company. A true and correct copy of an email dated February 8, 2017, attaching a file entitled "Channel H data sync CQ," is annexed hereto as **Exhibit W.** The attachment is annexed hereto as **Exhibit X**.

20. Floyd Russell also claims that in August, after "months of attempting to implement and utilize the Platform, it became apparent to [him] that the Platform did not work within the promised specifications." [Russell Decl., ¶ 6]  This statement is problematic for several reasons: first, the Platform went live on July 3 – it *was* implemented; second, neither Floyd nor anyone else at CQ ever once complained to Channel (H) that the Platform did not work; (3) Defendants requested a perpetual license of the Platform in August and were still seeking such a license as late as August 28 – they now claim that they realized that the Platform did not work within

11

promised specifications in August; and (4) if Floyd Russell truly believed that Ruby on Rails did not meet Defendants' requirements, it makes no sense that Defendants implemented the Platform, anyway, pitched it to at least two hospital networks, two insurance networks, and tried license it forever.

21. Floyd Russell further claims that he "began developing a completely different preauthorization solution to replace the Platform," "in that coverage determinations are now performed manually by a full-time staff of CQ employees." [Russell Decl., ¶ 7]. Not only is this inconsistent with Defendants' claim in their Petition that they developed a "Preauthorization **Software** Solution," but Floyd appears to be saying that because Channel (H)'s automated system was not automated enough, he used his twenty years of experience in software development to build a completely **manual** system. Floyd's claim makes no sense and is misleading, at best. Although a component of Defendants' "Preauthorization Software Solution" may be manual (contacting some insurance companies), so is the same exact portion of Channel (H)'s process, but that does not answer to what automated components Defendants are using in their solution, and how they gained the knowledge to build a system so quickly if they didn't rely on Channel (H)'s trade secrets. Defendants knew about the manual component of the Platform. A true and correct copy of a page titled, "Manual Process UCSD" is annexed hereto as **Exhibit Y**.

22. On September 19, shortly after Defendants cut off Channel (H)'s SRF, I confirmed from a contact at CQ that CQ was still receiving the pre-certifications through an automated system.

23. I respectfully request that Motion be granted.

12

Dated: December 22, 2017
      Amesbury, Massachusetts

DocuSigned by:

*Robert Capelli*

3EE2A1D095A2453...

ROBERT CAPELLI

13

# Exhibit L



## Channel(H) Demo - Cquentia (Labs)

| | |
|---|---|
| When: | **Mon May 16, 2016, 1:30 PM**<br>(UTC-05:00) Eastern Time (US & Canada) |
| Meeting code: | https://join.me/channelhmeetup |
| Notes: | |
| Invitees: | robert@channelh.co;  joyce@mdatarx.com;  kevin@cquentia.com;  medconsultanterik@hotmail.com ; |

**schedule follow-up**    **back to meetings**

# Exhibit M

# DOCUMENT TO BE FILED UNDER SEAL

# Exhibit N

From: **Floyd Russell** <floyd@cquentia.com>
Date: Tue, Jun 6, 2017 at 4:28 PM
Subject: RE: Updates on "Things that CQ Team wants built with Investment"
To: Robert Capelli <robert@channelh.co>, Kevin Jones <kevin@cquentia.com>
Cc: Ken Jones <ken@cquentia.com>


That's us. Call my cell if you get lost.

**From:** Robert Capelli [mailto:robert@channelh.co]
**Sent:** Tuesday, June 6, 2017 2:24 PM
**To:** Floyd Russell <floyd@cquentia.com>; Kevin Jones <kevin@cquentia.com>

**Subject:** Re: Updates on "Things that CQ Team wants built with Investment"


Floyd,

I should be at Lab by 11:00 tomorrow.  Just confirming address -

3740 Business Drive, Suite 101
Memphis, TN 38125

Thanks

On Wed, May 31, 2017 at 2:26 PM, Floyd Russell <floyd@cquentia.com> wrote:

> Let's do that. I have a full day open on Wednesday.
>
> **From:** Robert Capelli [mailto:robert@channelh.co]
> **Sent:** Wednesday, May 31, 2017 1:12 PM
> **To:** Floyd Russell <floyd@cquentia.com>
> **Subject:** Re: Updates on "Things that CQ Team wants built with Investment"
>
> Floyd,
>
> I planned on setting 110K aside for direct builds concerning CQ/Entities .... with the other 115k we are developing out better testing environment along side with the things outlined in the doc I sent you last week before team meeting.
>
> It is outlined in our Investment "use of proceeds section" and states "parties mutual agreement at closing" for use of Proceeds, so I want to make sure this is as tight as possible so we don't get into, "I thought we were going to build, or we need this built more than that built"  type situation.
>
> I can make it to Memphis next week on Wednesday ---- it looks like Kevin will be there, so maybe he can shed light as well.
>
> On Wed, May 31, 2017 at 1:50 PM, Floyd Russell <floyd@cquentia.com> wrote:
>> I'm in HI this week on vacation so I'll try to help as I can.
>>
>> You for sure need to set aside some funds for building out a test environment and the implementation of development changes to support a more pragmatic approach to code deployment. I will certainly be able to assist with that to some degree but you're going to need server resources at least so that you have something to deploy to.
>>
>> I might also just suggest trying to set aside funds as dry powder so that you can bring resources on board in a hurry when requirements do actually appear. I don't see this investment as VC-type funding that requires spending to justify the investment – unless the docs are requiring such a breakdown. And if it does I would still just earmark some funds as being available for future development support.
>>
>> Any chance you can make it to Memphis next week? I'm going to be there Tuesday – Friday next week and that would be a good opportunity to whiteboard things out.

**From:** Robert Capelli [mailto:robert@channelh.co]
**Sent:** Wednesday, May 31, 2017 12:17 PM
**To:** Floyd Russell <floyd@cquentia.com>
**Subject:** Updates on "Things that CQ Team wants built with Investment"

Floyd,

Do you have any updates on what CQ plans for us to build with the $110K I budged out of the investment funds.

I am reviewing investment docs and it would be of great help to know what they have in their mind before we get to deep into this.

Thanks

Exhibit O

---------- Forwarded message ----------
From: **Tami Druzba** <tami@cquentia.com>
Date: Thu, Sep 28, 2017 at 6:06 PM
Subject: Notice of Termination
To: "BILLING@CHANNELH.CO" <BILLING@channelh.co>, Robert Capelli <robert@channelh.co>
Cc: Ross Eichberg <ross@cquentia.com>

Attached hereto please find a Notice of Termination.

Regards,

**tami t. druzba**

4770 Bryant Irvin Court, Suite 300

Fort Worth, TX 76107

Office: 817.882.6900 X102

Fax: 817.887.2172

Cell: 817.694.0849

www.CQuentia.com

DISCLAIMER: This email does not constitute any agreement or signature by sender or sender's company that may be relied upon to transact or consummate any business whatsoever. Any representation herein to the contrary is hereby void and disclaimed. If there should be any conflict between any provision in the body of this email which conflicts with this Disclaimer, this Disclaimer shall control and remain superior. Notwithstanding any language or provision in the e-mail above or attachment hereto, this e-mail and all other electronic (including voice) communications from the sender or sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means or any other means. Any such intention or agreement is hereby expressly disclaimed.

**2 attachments**

CQuentia™

image002.png
6K

**Notice of Termination_Channel (H) 9.26.17.pdf**
141K

# Exhibit P



Brief of conversation with Alan Meeker and Kevin Jones:  11 minutes long

Kevin:  Started off by saying this gotten out of hand and Alan and Robert you needed to talk.

Alan:  Began by saying this was basically a shake down and he wouldn't be shuck down by me.

Alan:  Take the deal that is on the table, the 36K and sign release, and we wont have to go further.  You might think your attorney is nasty, I am nasty and fierce when it comes to people messing with business and the 10 of millions of dollars I've worked hard for.

Robert:  1st sorry you feel you are being attacked, I have only wanted information that you guys seem to not want to share from the beginning of this, but you expect me to just believe you when you say you aren't doing anything that Channel H was doing or you aren't copying the process.

Alan:  I am not showing you anything we are doing, I am not going to lift up the dress so you can see our trade secrets.  You have until 5:00pm tomorrow to sign and take the deal or I will make the next two years very unpleasant for you and your business.  Take a word of advice, mentor if you will, don't let your attorney make decisions about litigation, they always want to litigate, they don't have you or your business's best interested in mind.

# Exhibit Q

KJ

Kevin

Thu, Sep 28, 6:19 PM

I'm in a meeting till about 8 but can text. What's up

Just wanted to see if Ross was sending out proposal today as the day is about to end

Yes. He is having someone else send. He left an hour ago on plane

I just checked and I received termination letter was that the proposal?

I just want to make sure I am clear where we are.

No

It's not

That's just the official contract termination letter we are required to send

iMessage





**Kevin**



Kevin  I am running 10 minutes late can you <u>at 5:10</u> please

Yes

Calling in 5

Wed, Oct 4, 10:27 AM

Are you available for a quick call

On call --- will try you after ?

Delivered

Ok

Wed, Oct 4, 4:24 PM

Call me asap

Do you want to talk or just let this run its course? I am truly trying to help you here and help you avoid what could possibly cost you your business. I do not want to see that happen. I just want us to part ways. Amicably.

  iMessage 

# Exhibit R

**DOCUMENT TO BE FILED UNDER SEAL**

# Exhibit S

From: **Alan Meeker** <alan@cguentia.com>
Date: Sat, Jul 1, 2017 at 1:04 AM
Subject: Contact
To: "robert@channelh.co" <robert@channelh.co>

Robert

Just you and me here.

May we please have transparency here? Our UCSD account is worth in excess of $150milllion over the next 5 years. If we are going to miss a go live target, that's ok, we just need to set people's expectations.

Please contact Kenny soonest.


**Regards,**
**D. Alan Meeker**
**Chief Executive Officer**



**4770 Bryant Irvin Court, Suite 300**
**Fort Worth, Texas 76107**
**Telephone – 682-200-3028**
**Facsimile – 817-887-1269**
**Cellular - 817-307-2525**
**www.cguentia.com**

DISCLAIMER: This email does not constitute any agreement or signature by sender or sender's company that may be relied upon to transact or consummate any business whatsoever. Any representation herein to the contrary is hereby void and disclaimed. If there should be any conflict between any provision in the body of this email which conflicts with this Disclaimer, this Disclaimer shall control and remain superior. Notwithstanding any language or provision in the e-mail above or attachment hereto, this e-mail and all other electronic (including voice) communications from the sender or sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means or any other means. Any such intention or agreement is hereby expressly disclaimed.

# Exhibit T

---------- Forwarded message ----------
From: **Sandy Alcorn** <sandy@cquentia.com>
Date: Thu, Apr 13, 2017 at 1:23 PM
Subject: CQuentia / Wise Integration
To: Stephen Mallick <smallick@cquentia.com>, Floyd Russell <floyd@russellsolutions.net>, Robert Capelli <robert@channelh.co>, "Tallon, Angela" <atallon@wisehealthsystem.com>, Gail Culver <gail@cquentia.com>, "dcaldwell@wisehealthsystem.com" <dcaldwell@wisehealthsystem.com>

---------- Forwarded message ----------
From: **Grob, Christine J** <Christine.J.Grob@medstar.net>
Date: Mon, Jun 5, 2017 at 12:22 PM
Subject: FW: Multisite Cquentia Report Pilot Phase 2 - Technical Requirements Me
To: Robert Capelli <robert@channelh.co>


Need you on this and wasn't sure I had sent.

Let's discuss.

-----Original Appointment-----
**From:** Grob, Christine J [mailto:Christine.J.Grob@medstar.net]
**Sent:** Thursday, May 25, 2017 7:43 AM
**To:** Grob, Christine J; Chilcote, Stephen P; Darrell.Burris@nttdata.com; Dietze, Ce
**Subject:** Multisite Cquentia Report Pilot Phase 2 - Technical Requirements Meetin
**When:** Tuesday, June 6, 2017 2:00 PM-3:00 PM (UTC-05:00) Eastern Time (US &
**Where:** Conference Call: +1-888-453-4221, 2026155724


When: Tuesday, June 06, 2017 2:00 PM-3:00 PM (UTC-05:00) Eastern Time (L
Where: Conference Call: +1-888-453-4221, 2026155724
Note: The GMT offset above does not reflect daylight saving time adjustments.
+~+~+~+~+~+~+~+~+~+
Please forward to any other required attendees.
1. Purpose of Meeting/ Introductions – Christine
2. High-Level Project Overview – Customer
3. High-Level Technical Overview – Vendor
4. Technical Questions/Clarification
a. Enterprise Architecture
b. Security
c. Quality/Testing
d. Estimation
5. Additional Questions/Next Steps – Christine

MedStar Health is a not-for-profit, integrated healthcare delivery system, the largest in Maryland and the \

Exhibit U

# Conversation with Kevin Jones and Floyd Russell

Robert: Floyd, it sounds like you are saying you guys are going to do what Channel H is doing in house now with schedule and pre auths ?

Floyd: No, we are doing it manually.

Robert:  But you are doing what we do, manual has always been one of three ways we get results to post ?

Robert:  Do you receive Schedule API before the event happens, 3, 6, 10 days out ?

Floyd:  Yes

Robert:  Do you filter out the Insurance Identifiers to call coverage against ?

Floyd:  Yes

Robert:  Do you get coverage results on those patients for PGX ?

Floyd: Yes, but we do it manually.

Robert:  Do you get the results to give to Nurses so they know who is approved ?

Robert:  Do you post results to dashboard ?

Floyd:   No we don't post to dashboard.

Robert:  Do you post somewhere where they can print out list for the day ?

Floyd:  Yes

Robert:  Then you are doing exactly what Channel H was doing for you and UCSD.

Floyd:  So you are telling me I can't do my business ?

Robert:  I am telling you are doing Channel H's business.

# Exhibit V

7/7

Contracts — need to consolidate ⊗
  — outstanding work 3/9 contracts Kevin will do
  — payment owed $3k + fees
  — Next Steps? Dev /Timing/?

Floyd is bring Schedule Api / Auth is in house
  — check contracts / attorney
→ ask attorney about API / Patent / bonus?
→ Send all contracts to CQ — Kevin / Allan

/8 → $8000/ 2nd Contract Signed
Floyd / Kevin → No attorney needed
they are doing the whole thing = "Marcel"
                        → WTF

6/000k loan
Live in 5

100k /200   Ambulatory

Single Instance  /3 updates  45 Hospital
                              100  2 of Year

MDP —

Labs— incubation
Network — Opportunity to Collaborate (Stand
Marketplace —  170 / 40

Athena Colleton —S
          Scheduling / Appts
Clinical —→
Survey Encounter / Orders

# Exhibit W

From: **Robert Capelli** <robert@channelh.co>
Date: Wed, Feb 8, 2017 at 1:22 PM
Subject: Re: UCSD thru the Channel H
To: Alan Meeker <alan@cquentia.com>
Cc: Kenny Woods <kenny@mycapital1.com>, Floyd Russell <floyd@russellsolutions.net>, Jamison Feramisco
<jamison@cquentia.com>, "jferamisco1@gmail.com" <jferamisco1@gmail.com>


Gentlemen,

Here is a quick snapshot of the data elements Channel H  has available via live API(s).

This should give a decent level of substance to dive deeper tomorrow.

Cheers

On Mon, Feb 6, 2017 at 11:20 AM, Alan Meeker <alan@cquentia.com> wrote:

All:
Please plan to participate in a conference call to discuss all of the elements available from UCSD through
the Channel H feed.

This call will begin at 2:00 MST.

Dial In: 641.715.3580
Access Code: 441-873

# Exhibit X

# DOCUMENT TO BE FILED UNDER SEAL

# Exhibit Y

# DOCUMENT TO BE FILED UNDER SEAL